IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHERI HINES, | ) | Case No. 3:20-cv-620 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Sheri Hines, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This

matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).[1]

Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a

decision supported by substantial evidence, I recommend that the Commissioner's final decision

denying Hines's applications for DIB and SSI be AFFIRMED.

## II.     Procedural History

On April 10, 2017, Hines applied for DIB and SSI.  (Tr. 229-42).[2]  Hines alleged that she

became disabled on July 12, 2016, due to "1. Panic attacks; 2. Anxiety; 3. Depression; 4.

---

[1] On March 24, 2020, Chief Judge Patricia A. Gaughan issued a differentiated case management order
reflecting the automatic reference.  ECF Doc. 4.
[2] The administrative transcript appears in ECF Doc. 11.

Arthritis; 5. Fibromyalgia; [and] 6. PTSD." (Tr. 229-42, 267). The Social Security

Administration denied Hines's applications initially and upon reconsideration. (Tr. 71-138).

Hines requested an administrative hearing. (Tr. 165-66). ALJ Carrie Kerber heard Hines's case

on September 5, 2018 and denied the claims in a January 25, 2019 decision. (Tr. 9-70). On

January 21, 2020, the Appeals Council denied further review, rendering the ALJ's decision the

final decision of the Commissioner. (Tr. 1-6). On March 24, 2020, Hines filed a complaint to

obtain judicial review. ECF Doc. 1.

III.    Evidence

A.      Personal, Educational, and Vocational Evidence

Hines was born on June 16, 1966, and she was 50 years old on the alleged onset date.

(Tr. 229). Hines had an 11th grade education. (Tr. 39). And she had past work as a poultry

farm laborer, welding machine tender, mixer of food products, forklift operator, and deli worker.

(Tr. 12, 42-48).

B.      Relevant Medical Evidence

From September 17, 2015 through April 25, 2016, Hines saw Scott Jarvis, MD, for

treatment of her anxiety and hypoglycemia. (Tr. 366-69, 385-96). Hines told Dr. Jarvis that she

first had anxiety in 2005, that symptoms were intermittent, and that she had difficult falling

asleep and was fatigued. (Tr. 385). On February24, 2016, Hines told Dr. Jarvis that she had

issues with forgetfulness. (Tr. 393). And on April 25, 2016, Hines said that she had fearful

thoughts, difficulty sleeping, poor judgment, racing thoughts, hallucinations, excessive worry,

and conflict/stress in social situations. (Tr. 366). Throughout her treatment, Dr. Jarvis noted on

examination that Hines was fully oriented; had appropriate mood and affect; and had normal

memory, insight, and judgment.  (Tr. 369, 387, 391, 395).  Dr. Jarvis prescribed lorazepam initially and later duloxetine.  (Tr. 369, 388).

On May 5, 2016, Hines saw Esther Wrangler, Ph.D., for a diagnostic assessment.  (Tr. 763-80).  Dr. Wangler noted that Hines had no learning or communication difficulties.  (Tr. 765).  Hines reported normal job attendance and good performance at her past workplace.  (Tr. 765).  Dr. Wangler noted that Hines had depression and bereavement issues following her husband's suicide and son's heroin-related death.  (Tr. 771).  Hines said she carried a taser because she felt fearful of people, she had anger and traumatic/psychosocial stress related to her husband's and son's deaths and had attention and memory trouble due to her grief and stress.  (Tr. 771-72).  Dr. Wangler indicated that Hines had severe impairments in managing time and coping; moderately severe impairments in problem solving, family relationships, and productivity; moderate impairments in social networking, managing money, and safety; and mild to no impairment in communication, behavior norms, hygiene, grooming, and dressing.  (Tr. 772-73).  Hines said that she played darts at her mother-in-law's bar every Sunday.  (Tr. 774; *see also* Tr. 761).  Hines had full affect, circumstantial thought process, and preoccupied, derealized, and compulsive thought content.  (Tr. 775).  She had impaired attention, concentration, and memory.  (Tr. 775).  Dr. Wangler diagnosed Hines with PTSD and referred her for counseling and psychiatric care.  (Tr. 778-79).  At a follow-up on June 15, 2016, Hines said that she was coping better.  (Tr. 698).  On examination, Hines was well groomed and had cooperative behavior, depressed and numb mood, congruent affect, logical and blocked thought process, and impaired memory, attention, and concentration.  (Tr. 697-98).  Hines said that she was overwhelmed and forgot things.  (Tr. 698).

On June 15, 2016, Hines told Jenna Kimmel, CNP, that she was compliant with medication, had a boyfriend who lived with her, had normal speech, had hopeful mood, had

baseline cognition, had an improved mood when working (Tr. 781).  On September 9, 2016, Hines told Kimmel that she lost her job and had moderate anger.  (Tr. 805).  On examination on June 15 and September 9, 2016, Hines had average/cooperative behavior, clear speech, full/congruent affect, logical thought process, unremarkable thought content, unremarkable cognitive impairment (Tr. 782-83, 805-07).  On March 1, 2017, Hines told Kimmel that she didn't leave her house often because it was her comfort zone and her regular hobbies included darts and motorcycles.  (Tr. 464, 818).  Hines had appropriate/cooperative behavior, "some" depression, low anxiety, hopeful mood, full/congruent affect, clear speech, logical thought process, unremarkable thought content, and no cognitive impairments.  (Tr. 464-66, 818-20).

From August 25, 2016 through July 18, 2018, Hines saw Christina Hampshire, LSW, for counseling.  (Tr. 433-34, 502-05, 701-24, 749-62).  On August 25, 2016, Hines told Hampshire that she was coping better and becoming more stable as she got back into her routine.  (Tr. 702). Throughout her treatment, examinations showed that Hines was well groomed and had cooperative behavior, clear speech, depressed mood, logical thought process, and impaired memory, attention, and concentration.  (Tr. 433-34, 502-03, 701-02, 705-06, 709-10, 713-14, 721-22, 749-50, 757-58, 761-62).  Her affect ranged between flat, labile, constricted, and full. (Tr. 433, 502, 701, 705, 709, 713, 721, 749, 757, 761).

On November 30, 2016, Hines told Amy Lackey, RN, that she was doing well.  (Tr. 473). Lackey noted that Hines was well groomed and had a cooperative mood, bright/full affect, clear speech, logical thought process, no cognitive impairments, average intelligence, and social/cooperative mental status.  (Tr.  438, 458-59, 813). Lackey diagnosed Hines with PTSD, major depressive disorder, anxiety disorder, and panic disorder with agoraphobia.  (Tr. 460, 814).  On March 1,2 017, Hines told Lackey that she was "not great" due to family issues, and

4

Lackey noted that she had an anxious/irritated mood and constricted affect. (Tr. 442). On examination, Hines was well groomed, calm, cooperative, and had logical thought processes without any cognitive impairments. (Tr. 442-43). Hines had a "social" mental status. (Tr. 444).

On February 23 and April 6, 2017, Christine Ulrich, CNP, noted that Hines was negative for anxiety, depression, and insomnia. (Tr. 376, 381). On examination, Hines was fully oriented, had appropriate mood and affect, and had normal insight and judgment. (Tr. 378, 383).

On March 13, 2017, Hines told pharmacist Micah Sobota that she believed her medications weren't working. (Tr. 430). Sobota noted that Hines had an average demeanor, cooperative behavior, and clear speech. (Tr. 430). At a follow-up on April 14, 2017, Deanna Rego, LPN, increased Hines's medication dosage. (Tr. 452). Rego also noted that Hines was well groomed and had an average demeanor, cooperative behavior, clear speech, pleasant mood, full affect, logical thought process, unimpaired cognition, and social/cooperative mental status. (Tr. 452-53).

On August 9, 2017, Hines told Michael Rice, RN that she was doing "okay" and her medications were effective. (Tr. 510). On examination, Hines was well groomed and had a withdrawn demeanor, cooperative behavior, clear speech, calm/cooperative mood, full affect, logical thought process, no cognitive impairments, and social mental status. (Tr. 510-11).

On August 9, 2017, Hines told Kimmel that she still had flashbacks of her son's death, but she had more happy memories, was compliant with her medications, and had a neighbor whom she was close to. (Tr. 519). On examination, Hines had average/cooperative behavior, clear speech, full/congruent affect, logical thought process, unremarkable thought content, impaired abstraction, impaired attention/concentration, and good insight/judgment. (Tr. 519-20, 838-39). At a follow-up on October 4, 2017, Hines told Kimmel that she felt happier with her

5

grandkids and had more energy with her medication.  (Tr. 848).  Examination revealed an average/cooperative behavior, clear speech, full/congruent affect, hopeful mood, logical thought process, unremarkable thought content, no cognitive impairments.  (Tr. 850-51).

On October 11, 2017, and January 8, 2018, Ulrich noted that Hines had normal memory, appropriate mood and affect, normal insight, normal judgment (Tr. 564, 581-82).  Ulrich recommended continued medications, adequate sleep and exercise, and counseling to help her anxiety.  (Tr. 565).

On January 31 and March 28, 2018, Kimmel noted that Hines was compliant with medication and lived with her significant other.  (Tr. 854, 861).  On examination, Hines had average/cooperative behavior, clear speech, sad/stressed/angry mood, logical thought process, unremarkable thought content, impaired abstraction and memory, and good judgment/insight. (Tr. 856, 863-64).  On July 19, 2018, Hines told Kimmel that she was doing a "little better" and went outside sometimes.  (Tr. 873).  She had less anger and depression.  (Tr. 873).  On examination, Hines had average/cooperative behavior, logical thought process, unremarkable thought content, impaired memory, alert and oriented to all spheres, and good judgment/insight. (Tr. 875-76).

On September 7, 2018, Hines saw Ali Almudallal, MD, for treatment of "memory loss of unknown cause."  (Tr. 900).  Dr. Almudallal noted that Hines had reported experiencing memory loss for the previous two years, which began around the time her husband and son died.  (Tr. 900).  Hines had trouble focusing, misplaced items at home, and forgot what she was saying mid conversation.  (Tr. 900).  Notwithstanding her memory loss, Hines did not get lost when driving and was able to cook and clean for herself.  (Tr. 900).  On examination, Hines appeared well and was fully oriented.  (Tr. 902).  She had normal memory, good insight, poor concentration at

times, normal fund of knowledge, and a flat affect.  (Tr. 902).  Dr. Almudallal determined that

Hines's memory issues suggested pseudodementia or masked depression.  (Tr. 903).

### C.      Relevant Opinion Evidence

#### 1.      Treating Nurse Opinion – Jenna Kimmel, CNP

Kimmel completed an undated "medical source statement" evaluating Hines's mental

capacity.  (Tr. 897-99).  Kimmel said that Hines had mild impairments in her ability to accept

instruction or respond appropriately to supervisor criticism; work in coordination with or in

proximity to others without distracting them or exhibiting behavioral extremes; respond

appropriately to co-workers or peers; work in cooperation with or in proximity to others without

being distracted by them; process subjective information accurately; use appropriate judgment;

carry through instructions; complete tasks independently; respond appropriately to changes in the

work setting; and be aware of normal hazards and take necessary precautions.  (Tr. 897-98).

Hines had moderate limitations in her ability to relate to the general public; maintain socially

appropriate behavior; maintain attention and concentration for more than brief periods of time;

remember location, workday procedures, and instructions; behave predictably, reliably, and in an

emotionally stable manner; maintain personal appearance and hygiene; and tolerate customary

work pressures.  (Tr. 897-99).  And Hines had extreme limitations in her ability to perform and

complete work tasks in a normal workday or work week at a consistent pace; and perform at

production levels expected by most employers.  (Tr. 897-98).  Kimmel indicated that Hines

would be absent from work more than 5 days per month and would deteriorate if she was under

stress.  (Tr. 899).

#### 2.      Consultative Examiner Opinion – Christopher Ward, Ph.D.

7

On July 11, 2017, Christopher Ward, Ph.D., interviewed Hines and completed an assessment of her mental functions.  (Tr. 495-501).  Dr. Ward determined that Hines had no difficulty understanding complex instructions, no difficulty remembering instructions, no significant problems learning or carrying out work related tasks, and adequate task persistence.  (Tr. 499-500).  Hines was cooperative, alert, responsive, and oriented.  (Tr. 498).  She was adequately groomed.  (Tr. 498).  And she could converse effectively.  (Tr. 499).  Hines had some difficulty maintaining consistent attention, could be expected to have difficulty engaging with co-workers and supervisors due to her anxious and emotionally overwhelmed state, and could have emotional instability when presented with critical supervisory feedback.  (Tr. 499-500).  Her emotional trauma could compromise her ability to respond appropriately to work pressures in a competitive work environment.  (Tr. 500).

### 3.       State Agency Consultants' Opinions

On July 24, 2017, state agency consultant Kristen Haskins, Psy.D., assessed Hines's mental functional capacity based on a review of her medical records.  (Tr. 79- ).  Dr. Haskins determined that there was no evidence of a limitation or no significant limitation in remembering locations and work-like procedures or understanding and remembering simple or detailed instructions, but she would have mild intermittent difficulties in understanding and memory due to her anxiety and depression.  (Tr. 79, 83).  Hines had moderate limitations in her ability to maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 79, 83).  She had no significant limitations in carrying out short or detailed instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an

8

ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, and making simple work-related decisions.  (Tr. 83).  Dr. Haskins specified that Hines was precluded from quota driven work and could complete short cycle tasks without a fast pace demand.  (Tr. 83).  Dr. Haskins said that Hines was moderately limited in her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 79, 84).  Dr. Haskins explained that Hines was capable of superficial interactions with co-workers and supervisors but should avoid frequent contact with the general public.  (Tr. 84).  Dr. Haskins also said that Hines would "perform best in a solitary environment without over the shoulder supervision."  (Tr. 84).  Dr. Haskins said that Hines was moderately limited in her ability to respond appropriately to changes in the work setting.  (Tr. 84).  On September 8, 2017, Courtney Zeune, Psy.D., concurred with Dr. Haskins's opinion.  (Tr. 112, 116-18).

          **D.**       **Relevant Testimonial Evidence**

At the ALJ hearing, Hines testified that she felt she was unable to work because she had panic attacks when she was around too many people, was scared to go anywhere by herself, had flashbacks to finding her son dead (especially after touching cold things), and crying spells.  (Tr. 50, 61-62).  Hines left her house two or three times a week, went to the store on a regular basis, and went to mental health treatment once a month.  (Tr. 50-51).  She slept four or five hours per night and took naps every day.  (Tr. 51).  And she had forgetfulness, which caused her to lose her place mid conversation and leave items cooking on the stove.  (Tr. 55, 59).  Her medication did not help her sleep issues, but it stopped her panic attacks.  (Tr. 51-52).  Hines said that she

showered every other day and kept up with her household chores.  (Tr. 56).  For entertainment,

Hines played darts with her neighbor.  (Tr. 57).

Hines testified that she had difficulty getting along with others because she didn't want to

get to know other people, but she saw her neighbor daily and relied on her for emotional support.

(Tr. 50, 55-56).  She said that she didn't trust people because her son's best friend had given him

a joint with fentanyl in it and robbed him after her was dead.  (Tr. 58).  And she would avoid

people when at the store.  (Tr. 61).

## IV.     The ALJ's Decision

On January 25, 2019, the ALJ issued a written decision denying Hines's claims.  (Tr. 12-

25).  The ALJ made the following paraphrased findings relevant to Hines's arguments on judicial

review:

> 5.  Hines had the residual functional capacity to perform medium work, except
> that she could only perform frequent climbing of ramps/stairs/ladders/ropes;
> frequent stooping, crouching and crawling; capable of understanding,
> remembering and carrying out simple tasks that are not fast paced, meaning the
> pace of productivity is not dictated by an external source over which she has no
> control; occasional interaction with the public; no work requiring tandem tasks;
> no responsibility for conflict resolution; no more than simple work-related
> decision making; and the work routine should be repetitive from day to day with
> few and expected changes.  (Tr. 17).
>
> The state agency psychological consultants stated that the claimant was precluded
> from quota driven work, but she could complete short cycle tasks in a setting
> without fast pace demands, and she was capable of superficial interactions with
> coworkers and supervisors, but she should avoid frequent contact with the general
> public and she would perform best in a solitary environment without over the
> shoulder supervision.  The consultants further determined that the claimant was
> capable of adjusting to occasional changes in the work setting but her ability to
> handle stress and pressure in the workplace would be reduced, but adequate to
> handle tasks without strict time limitations or production standards.  The
> undersigned finds the administrative medical findings persuasive.  (Tr. 19-20).
>
> Jenna Kimmel's opinion was not persuasive because it was not supported by the
> medical evidence.  In August 2017, Kimmel noted that Hines had stated that she
> was doing okay, that her progress related to her behavioral health was good, that

10

her medications were somewhat effective.  Hines appeared well groomed, which was inconsistent with her opinion that Hines had moderate limitations in her ability to maintain her personal appearance and hygiene.  Hines's thought processes were logical and she had no impairment with her attention and concentrating.  (Tr. 21).

Based on her findings and testimony from a vocational expert, the ALJ determined that Hines had not been under a disability from July 12, 2016, through the date of her decision.  (Tr. 25).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a

11

"zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*

*v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

decisions of administrative agencies for harmless error.").  Furthermore, the court will not

uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.*

*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a

reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

**B.      Step Four: Integration of State Agency Consultants' Opinions into RFC**

Hines argues that the ALJ failed to draw an accurate and logical bridge between her conclusion that the state agency psychological consultants' opinions were "persuasive" and her RFC finding. ECF Doc. 12 at 7-10; ECF Doc. 14 at 2-5. Specifically, Hines asserts that the ALJ failed to explain why she did not integrate into the RFC the state agency consultants findings that Hines: (1) was limited to no more than superficial interaction with coworkers or supervisors; and (2) would perform best in a solitary work environment without over-the-shoulder supervision. ECF Doc. 12 at 9-10. Hines also notes that there is a difference between frequency of contact limitations (frequent, occasional) and quality of contact limitations (superficial). ECF Doc. 12 at 9-10.

The Commissioner responds that the ALJ *did* incorporate the superficial interaction limitation into the RFC by limiting Hines to no tandem work. ECF Doc. 13 at 11. The Commissioner argues that the ALJ was not required to incorporate the best-performance condition from the state agency consultants' opinions because the RFC is a baseline measure, not an optimization measure. ECF Doc. 13 at 12. Further, the Commissioner argues that the ALJ's

13

finding that the state agency consultants' opinions were persuasive did not require the ALJ to adopt each limitation verbatim or explain reasons for not adopting each limitation on a piecemeal basis.  ECF Doc. 13 at 11.

In her reply, Hines argues that the Commissioner's argument that the "no tandem tasks" limitation accounted for the state agency consultants superficial-interaction limitation is an improper *post hoc* rationalization because the ALJ never discussed the superficial-interaction limitation.  ECF Doc. 14 at 3-4.  Hines also asserts that the "no tandem tasks" limitation accounted only for coworkers, not supervisors.  ECF Doc. 14 at 4.  Hines further contends that the ALJ was not permitted to simply ignore the best-performance conditions in the state agency consultants' opinions but had to provide some explanation for rejecting them.  ECF Doc. 14 at 4-5.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC reflects the most that a claimant can do, despite her impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).  An RFC does not reflect the optimized or best conditions for a claimant's work.  *See Horinek v. Saul*, No. 1:19-cv-2141, 2020 U.S. Dist. LEXIS 133252, at *26 (N.D. Ohio Jul. 7, 2020) ("[T]he ALJ was not required to create an optimal work setting for Plaintiff.  'Optimal conditions . . . are not necessary ones.'" (citing *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85-86 (D. Mass. 2018))).

In determining a claimant's RFC, an ALJ must consider all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e). An ALJ may "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Nevertheless, an

14

ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  .

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  However, an ALJ improperly "cherry-picks" evidence when her decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715, at *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881 (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

The ALJ applied proper legal standards in evaluating the state agency opinions.[3]  42 U.S.C. § 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Here, the ALJ complied with the regulations by not giving any particular weight to the state agency consultants' opinions.  20 C.F.R. §§ 404.1520c(a), 416.920c(a); (Tr. 19-20).  Instead, the ALJ properly indicted that she found the state agency consultants' opinions persuasive in assessing Hines's RFC because those opinions were consistent with and supported by other evidence in the record.  (Tr. 19-20); 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2)  The ALJ was also not required to adopt each limitation from the state agency physicians' opinions merely because she found those opinions persuasive.  *Reeves*, 618 F. App'x at 275.  But she did have a duty to explain any inconsistencies between the state agency consultants' opinions and her ultimate RFC finding.  *Rogers*, 2018 U.S. Dist. LEXIS 68715, at *44; *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881.

And the ALJ did not fail to meet her duty to explain inconsistencies between the state agency consultants' opinions and her ultimate RFC finding.  Hines's argument that the ALJ's opinion was inconsistent with the state agency consultants' opinions that she capable of superficial interactions with co-workers and supervisors but should avoid frequent contact with the general public is unavailing.  The ALJ integrated this part of the state agency consultants' opinions into her RFC finding by limiting Hines to: (1) no external source driving productivity; (2) occasional interaction with the public; (3) no tandem work; (4) no responsibility for conflict resolution; and (5) simple, repetitive work with few changes.  *Compare* (Tr. 17), *with* (Tr. 84). Further, because an RFC is not an optimization measure, the ALJ had no duty to explain why she did not integrate into the RFC the state agency consultants' statement that Hines would "perform best" in a solitary environment without over the shoulder supervision.  (Tr. 84); 20 C.F.R. §§

---

[3] Because Hines does not argue that substantial evidence did not support the ALJ's evaluation of the state agency consultants' opinions, I do not address that issue.

16

404.1545(a), 416.945(a); SSR 96-8p, 1996 SSR LEXIS 5; *Horinek*, 2020 U.S. Dist. LEXIS 133252, at \*26.  Nevertheless, the ALJ's RFC finding was *consistent* with this opinion as well, for the same reasons discussed above.  *Compare* (Tr. 17), *with* (Tr. 84).  Thus, no inconsistency triggered the requirement for the ALJ to give greater explanation to the differences between the RFC and the state agency consultants' opinions.  *Rogers*, 2018 U.S. Dist. LEXIS 68715, at \*44; *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881.

Because the ALJ applied proper legal standards in evaluating the state agency consultants' opinions and formulated an RFC that was consistent with those opinions, the ALJ did not fail to build an accurate and logical bridge between the state agency consultants' opinions and his RFC finding.  *Rogers*, 2018 U.S. Dist. LEXIS 68715, at \*44; *Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881.  Accordingly, the ALJ's evaluation of the state agency consultants' opinions must be AFFIRMED.

### C.    Step Four: Weighing of Treating Counselor Opinion

Hines argues that the ALJ failed to properly evaluate Kimmel's treating therapist opinions.  ECF Doc. 12 at 11-14.  Hines asserts that substantial evidence did not support the ALJ's finding that Kimmel's opinion was inconsistent with treatment notes.  ECF Doc. 12 at 11-12.  Instead, Hines contends that the record as a whole shows that Kimmel's opinion was consistent with treatment notes from other providers at Coleman Behavioral, Dr. Almudallal's treatment notes, and Dr. Ward's examination notes.  ECF Doc. 12 at 12-14.  Hines argues that the ALJ should have given greater weight to the socialization, concentration, and attention limitations in Kimmel's opinion.  ECF Doc. 12 at 14.

The Commissioner responds that substantial evidence supported the ALJ's conclusion that Kimmel's opinion was not persuasive because it was inconsistent with Kimmel's own notes

17

indicating that Hines reported doing well, had a calm and cooperative mood on examination, was

well groomed, and had logical thought processes.  ECF Doc. 13 at 13-15.  The Commissioner

asserts that Hines's argument – that other evidence was consistent with Kimmel's opinion –

"misses the point" and "fails to show" how the ALJ erred in concluding that Kimmel's own

treatment notes were inconsistent with her opinion.  ECF Doc. 13 at 14-15.  Further, the

Commissioner contends any error was harmless because Hines has not shown that further

crediting Kimmel's opinion would have demanded a different RFC.  ECF Doc. 13 at 14.

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in how she weighed Kimmel's opinion.  The ALJ did not give any particular weight to

Kimmel's opinion, but properly explained that he did not find it persuasive because it was

inconsistent with her own treatment notes.  20 C.F.R. §§ 404.1520c(a), 416.920c(a); (Tr. 21).

And substantial evidence supported the conclusion that Kimmel's opinion was inconsistent with

her own treatment notes, including: (1) findings that Hines had cooperative behavior, clear or

normal speech, hopeful mood, baseline cognition, full/congruent affect, logical thought process;

unremarkable thought content; and no cognitive impairments; (2) notes that Hines was well

groomed; (3) notes that Hines reported an improved mood when working and felt happier when

she was with her grandchildren, and had more energy; and (4) notes that Hines had more energy

with her medication.  (Tr. 464-66, 519-20, 781-83, 805-07, 818-20, 848, 850-51, 856, 863-64,

875-76).

That Hines can point to other evidence in the record that might have supported Kimmel's

opinion is unavailing.  This court does not review the record to determine whether evidence

could have supported a different result, but whether evidence supported the ALJ's decision.

*Biestek*, 139 S. Ct. at 1154; *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476.  And even if a

preponderance of the evidence were to support a different conclusion, this court could still not reverse when evidence in the record supported the ALJ's decision. *Biestek*, 139 S. Ct. at 1154; *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476.  Further, in the same manner that Hines can point to other evidence that supports Kimmel's opinion, the record also contains evidence inconsistent with Kimmel's opinion.  Such evidence includes: (1) Dr. Jarvis's findings that Hines was fully oriented and had appropriate mood/affect, normal memory, normal insight, and normal judgment; (2) Dr. Wanger's notes that Hines had no learning or communications difficulties, was able to cope better with treatment, was well groomed and cooperative, and had logical thought process; (3) Hampshire's notes that Hines was able to cope better with treatment, became more stable as she got back into a routine, was well groomed, had cooperative behavior, and had logical thought process; (4) Lackey's notes that Hines was doing well, was well groomed, and had cooperative mood, full affect, clear speech, logical thought process, no cognitive impairments, average intelligence, and social/cooperative mental status; (5) Ulrich's findings that Hines was negative for anxiety/depression/insomnia, was fully oriented, had appropriate mood and affect, had normal insight and judgment, and had normal memory; (6) Rice's notes that Hines's medications were effective, she was well groomed, and she had cooperative behavior, clear speech, calm/cooperative mood, full affect, logical thought process, no cognitive impairments, and social mental status; and (7) Dr. Almudallal's notes that Hines had normal memory, good insight, and a normal fund of knowledge.  (Tr. 369, 378, 383, 387, 391, 395, 433-34, 438, 442-44, 458-59, 502-03, 510-11, 564, 581-82 697-98, 701-02, 705-06, 709-10, 713-14, 721-22, 749-50, 757-58, 761-62, 765, 774, 813, 902).

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in weighing Kimmel's opinion, the ALJ's decision to find Kimmel's

opinion not persuasive fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545.  Accordingly, the ALJ's finding that Kimmel's opinion was not persuasive must be AFFIRMED.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Hines's applications for DIB and SSI be AFFIRMED.

Dated: February 25, 2021

Thomas M. Parker
United States Magistrate Judge

------------------------------------------------

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).